Littleton, Judge,
delivered the opinion of the court:
The plaintiff sues to recover $3,006 as damages for an alleged breach of contract by defendant. On June 15, 1948, plaintiff entered into a construction contract with the Navy Department whereby plaintiff was to furnish the materials, labor and equipment necessary to perform the work of erecting antenna poles and transmission wire poles; to construct access roads, and perform certain miscellaneous work at the Navy Communication Station, Annapolis, Maryland. The work was to be completed, as originally specified, on or before October 13, 1948.
The relevant portions of the contract specifications provide:
*403 2-01. General requirements. — The erection of antenna support and transmission line poles shall be accomplished in the groups as hereinafter set forth and shall be governed by the restrictions as hereinafter specified.
2-02. Bestrietions. — * * * Poles specified or indicated to be erected or removed shall in no case be stored at the site of the erection or removal, but shall be immediately erected or removed from the site. Poles specified to be disposed of shall be (a) stored at the site of the culvert, where directed, for use as piles; (b) stored on the reservation, where directed, for cutting into short lengths for deadmen; or (c) removed from the reservation.
2-03. Sequence of construction. — The erection and removal of antenna and transmission line poles shall be accomplished in three groups as directed. The three groups are as follows:
Group A.
^ *
2. (a) Existing antenna wires to be removed by the Government.
(b) Remove 4 long poles for disposal.
(c) Remove 3 short poles.
(d) Erect 5 antenna support poles, approximately 90 feet long.
te) Set 2 deadmen.
(f) Antenna then to be installed by the Government.
3. (a) Existing antenna wires to be removed by the Government.[1]
2-04. The procedure for erection of antenna supports and transmission line poles will be determined by the Government in a manner to cause the least possible interference with the operation of the Navy Communication Station. * * *
The specifications required the defendant to first remove the existing antenna wires. Following this the plaintiff was to remove the old poles either for re-erection, disposal, or for use as piles for the culvert in connection with the road work. Then plaintiff was to erect the new poles and set the deadmen. Following this work the defendant was then to install the antenna wire on the new poles. The defendant concedes, and the evidence clearly shows, that defendant did not follow the sequence of work as set forth *404 in the specifications in that defendant failed to promptly remove the wire from the old poles. This delayed and disrupted the orderly progress of plaintiff’s work, resulting in delay and expense to plaintiff. The plaintiff was prevented from immediately removing the old poles and was required to move its heavy equipment to another pole and later return to remove the old pole. Also, some of the old poles were designated by defendant for use as piles in the construction of the culvert under part of the road. The plaintiff, obviously, could not remove or use the designated poles for piles until defendant had removed the wire.
The defendant’s failure to promptly remove the wires in the sequence expressly required by the contract specifications delayed the culvert and road work beyond the original completion date of the contract and threw the work into the winter months. In early November plaintiff was authorized to purchase the poles needed for piles rather than wait until the wires were removed by defendant from the old poles. The plaintiff purchased the poles and proceeded with the road work.
On January 28, 1949, plaintiff was ordered to suspend work because of inclement weather. On March 24, 1949, plaintiff was ordered to resume work and the contract was completed in May 1949, within the contract time, as extended.
The plaintiff rented a caterpillar and roller to perform the road work. The roller, which was idle from December 1,1948, to April, 1949, cost plaintiff $335 per month or $1,340 for the idle time. The caterpillar, which was idle from December 1, 1948, to February 1, 1949, cost plaintiff $583 per month or $1,166 for the idle time. The plaintiff did not return this equipment to the owner from whom it had been rented during the work stoppage, due to the impossibility of anticipating the duration of such stoppage, and due further to the fact that such equipment was difficult to obtain on short notice, especially during the spring.
The plaintiff requested payment by defendant for the extra costs incurred by reason of defendant’s failure to follow the sequence of work set forth in the specifications, in the performance of the work required of defendant by the contract. The plaintiff’s request for $1,790 for extra cost on the antenna *405 work is itemized in finding 15. The plaintiff’s request for $2,406 was for the rental for the idle time of the caterpillar and roller, due to the failure of defendant to perform its part of the work under the contract, as it should and could have done within a reasonable time.[2]
The defendant paid plaintiff the $1,790 requested for the antenna work by change order “C” dated June 21,1949, which said in part: “Owing to the following change in the work, namely, revision in plans and procedure of construction by the Government, the contract price, in accordance with Article 10 of the contract, is hereby increased by $1,790.00 * *
The second item of extra costs of $2,506, the one for which plaintiff now seeks recovery, was denied by letter dated June 27,1949, “on the grounds that it is in the nature of damages and therefore not compensable [administratively] under the contract.” Both claims were founded on defendant’s failure to follow the sequence of work expressly set forth and called for in the specifications. Upon plaintiff’s further request for payment it was subsequently denied again by a letter dated August 26,1949, which stated:
In response to your oral inquiry, you are advised that report from the Public Works Office at the Naval Academy does not indicate that the Government so modified your procedures under the subject contract as to cause additional costs and entitle you to additional compensation.
Accordingly, there would appear to be no basis for reversing the Bureau’s decision denying your claim for $2,406 which was communicated to you .by the Officer in Charge of Construction on 27 June 1949.
This is a final decision of the Contracting Officer under Article 16 of the contract.
The plaintiff did not appeal this decision of the contracting officer.
It is clearly apparent from the evidence that defendant breached the contract. In section 2-03 of the contract specifications defendant agreed to remove the wire from the old poles before plaintiff erected the new poles so that plaintiff could remove the old ones at the same time it erected the *406 new ones and use the designated poles as piles in construction of the culvert. This defendant failed to do. The defendant did not issue a change order under article 10 amending the specifications and make an equitable adjustment therefor. Change order “C” relating to item II of plaintiff’s claim came only after the work had been completed. The defendant’s breach of contract directly caused plaintiff to incur additional expense not only in moving its equipment about with the resulting delays for which defendant paid $1,790 under change order “C” on item II of the claim, but also prevented the completion of the culvert and road work before the winter months, which resulted in plaintiff’s additional expense of $2,506 (findings 7-20). The evidence shows that under the circumstances plaintiff diligently prosecuted the work and would have completed the road work before the winter months had defendant followed the sequence of work set forth in the specifications, in the performance of the work required of it. The $2,506 rental cost of the idle equipment was a direct result of defendant’s breach of the contract and defendant is liable therefor. George A. Fuller Co. v. United States, 108 C. Cls. 70 and the cases cited therein; Line Construction Co. v. United States, 109 C. Cls. 154; Anthony P. Miller, Inc. v. United States, 111 C. Cls. 252; Rafael Torres, Jr. v. United States, 126 C. Cls. 76. There was no evidence to support the reasons asserted by the contracting officer in the first paragraph of the letter of August 26,1949. Act of May 11,1954 (68 Stat. 81, 41 U. S. C. A. 321, 322).
The defendant’s contention that section 2-04 of the specifications permitted a change in sequence of the work set out in section 2-03 is not supported by the evidence and is, therefore, without merit. Section 2-04 allowed defendant to determine which group should be done first, second, etc., and which poles were to be removed first, second, etc., so as to cause the least interference with the communication operations, but certainly this section did not allow defendant to ignore the sequence of the work to be done with respect to each pole, which was clearly specified in section 2-03.
The defendant’s other contention is that plaintiff did not exhaust his administrative remedies since it failed to appeal from the contracting officer’s denial of its claim, and that that *407 decision is final and binding under United States v. Blair, 321 U. S. 730. Under the facts in this case we do not agree. The contracting officer, or his duly authorized representative, admitted a change in the plans and procedure of construction and by change order “C” dated June 21,1949, paid plaintiff $1,790 as part of the extra expense incurred by reason of such change. Plaintiff’s protests were adequate. The remainder of plaintiff’s claim amounting to $2,506 was denied by letter dated June 27, 1949, on the ground that it was a claim for unliquidated damages for breach of contract, notwithstanding the fact that both of plaintiff’s claims for $1,790 and $2,506, were founded on defendant’s failure to follow the sequence of work set forth in the specifications. The letter dated August 26,1949, upon which defendant relies, refers to the June 27,1949, letter and appears to be no more than an affirmation of that decision which clearly was not decided on a question of fact. No findings of fact were made by the contracting officer. Even if the August letter is considered by itself the most that can be said for defendant is that it is ambiguous. Certainly if the contracting officer’s decision is to be accorded finality it should be unequivocal and clear enough to apprise plaintiff of whether it was based on a question of fact or law so that plaintiff can reasonably determine whether an appeal is warranted. When the decision is ambiguous, as the August letter is, we must look to the surrounding circumstances to determine its meaning. In so doing we conclude that the contracting officer’s decision was based on a question of law and, therefore, it was unnecessary for plaintiff to take an appeal therefrom. Southeastern Oil Florida, Inc. v. United States, 127 C. Cls. 480; Cramp Shipbuilding Co. v. United States, 122 C. Cls. 72, 99; Continental Illinois National Bank v. United States, 121 C. Cls. 203, 246; Pottsville Casting & Machine Shops v. United States, 121 C. Cls. 129; Anthony P. Miller, Inc. v. United States, supra, at 330.
The plaintiff claims $500 as overhead in its petition but offered no proof on the matter and failed to mention it in its briefs. Therefore, that item is disallowed. The plaintiff is entitled to recover $2,506.
It is so ordered.
Laeamoee, Judge; MaddeN, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
*408 FINDINGS OF FACT
The court having considered the evidence, the briefs and argument of counsel, and the report of Commissioner Cur-rell Vance, makes the following findings of fact:
1. Plaintiff is a corporation organized and existing under the laws of the State of Maryland, with its office and principal place of business located in the City of Baltimore, Maryland. By this action plaintiff claims the sum of $2,506, representing the rental cost paid by it for two pieces of road-building equipment, for respective periods of four and two months during the winter of 1948-1949, held over on the job involved herein by reason of previous delays by the defendant.
2. On June 15, 1948, plaintiff entered into construction contract No. NOY-16054 with the defendant represented by the Bureau of Yards and Docks, Navy Department, for work to be performed at the Navy Communication Station located at the United States Naval Academy, Annapolis, Maryland. Such work consisted of furnishing the materials, work, labor, services and equipment required to perform the work of erecting antenna poles and transmission wire poles and to construct access roads at the Navy Communication Station, Annapolis, Maryland, complete and ready for use, and certain miscellaneous work. Work was to be commenced as promptly as possible and to be completed in its entirety on or before the 13th day of October 1948, in accordance with plans and specifications attached to the contract. The contract consideration was $40,764.
3. The antenna support poles were located about the Communication Station and adjoining golf course in groups of four poles, each group forming a diamond-shaped pattern and supporting one antenna. The transmission line poles were shorter poles which connected the antenna poles with the Communication Station. The contract called for replacement of seven sets of antenna support poles and the erection of two additional sets. It was defendant’s obligation to *409 first remove the wires from the old poles and thereupon the plaintiff’s duty to remove the old poles from the ground and erect the new poles.
4. Under the contract plaintiff was required to construct an access road, approximately 2,400 feet in length. About half way of this distance was a low, marshy spot, and here the contract provided for the construction by plaintiff of a concrete culvert, supported by piles. The piles were to be secured from old antenna poles designated by defendant, which were to be removed by plaintiff after defendant removed the wires.
5. Plaintiff was given notice to proceed on June 8, 1948, receipt of which was acknowledged by the plaintiff on June 15,1948, and plaintiff actually started operations two weeks later on June 29, 1948, when a small force began cleaning and grubbing. On July 8, 1948, plaintiff notified the Office of Public Works at the Naval Academy, which had charge of the work under the contract, that it was prepared to start work on the erection of the antenna support and transmission line poles, and on July 18,1948, was advised by Public Works in this regard as follows:
$ $ $ $ $
The locations of poles and deadmen have been staked out in the field with the exception of a few transmission line poles. Work of excavation and pole erection can commence at any time. Prior to actual digging, you are to contact Mr. Walter W. Goodhue at the Navy Communications Station who will indicate to you the exact purpose of all stakes. Poles are available from the Communications Station stock pile so the erection of the poles can proceed as the holes are dug. No holes should be allowed to stand for longer than one week before erecting the poles and all holes shall be sounded to insure that they are at the required depth before poles are erected. Holes for deadmen shall not be dug until deadmen are ready to be installed.
6. With regard to the erection of the antenna support and transmission line poles, the contract specifications provided:
2-01. General requirements. — The erection of antenna support and transmission line poles shall be accomplished in the groups as hereinafter set forth and shall be governed by the restrictions as hereinafter specified.
*410 2-02. Restrictions. — * * * Poles specified or indicated to be erected or removed shall in no case be stored at the site of the erection or removal, bnt shall be immediately erected or removed from the site. Poles specified to be disposed of shall be (a) stored at the site of the culvert, where directed, for use as piles; _(b) stored on the reservation, where directed, for cutting into short lengths for deadmen; or (c) removed from the reservation.
2-03. Sequence of construction. — The erection and removal of antenna and transmission line poles shall be accomplished in three groups as directed. The three groups are as follows:
Group A:
1. (a) No preliminary work by the Government.
Clear area indicated.
(c) Erect 4 antenna support poles, approximately 90 feet long.
(d) Erect 6 transmission line poles approximately 30 feet long.
(e) Set 3 deadmen.
(f) Antenna then to be installed by the Government.
2. (a) Existing antenna wires to be removed by the Government.
(b) Remove 4 long poles for disposal.
Remove 3 short poles.
Erect S antenna support poles, approximately 90 feet long.
(e) Set 2 deadmen.
(f) Antenna then to be installed by the Government.
3. (a) Existing antenna wires to be removed by the Government.
Remove 3 long poles for disposal.
Erect 4 antenna support poles, approximately 90 feet long.
(d) Erect 2 transmission line poles, approximately 30 feet long.
Set 4 deadmen.
Antenna then to be installed by the Government.
4. (a) Existing antenna wires to be removed by the Government.
(h) Remove 4 long poles for reerection.
(e) Erect 3 antenna support poles, approximately 90 feet long.
*411 (d) Set 3 deadmen.
(e) Antenna then to be installed by the Government.
(a) No preliminary work by the Government.
(b) Clear land for network poles and beyond, where indicated.
(c) Erect 4 antenna support poles, approximately 90 feet long.
(d) Erect 6 transmission line poles, approximately 30 feet long.
(e) Set 2 deadmen.
(f) Antenna then to be installed by the Government.
(a) Existing antenna wires to be removed by the Government.
(b) Remove 5 long poles and 2 poles approximately 40 feet long for disposal.
Remove 11 short poles.
d) Erect 4 antenna support poles, approximately 90 feet long.
(e) Erect 7 transmission line poles, approximately 30 feet long.
Set 3 deadmen.
g) Antenna then to be installed by the Government.
Group B:
1. (a) Existing antenna wires to be removed by the Government.
Remove 4 long poles for disposal.
(c) Remove one short pole.
(d) Erect 4 antenna support poles, approximately 90 feet long.
(e) Erect 5 transmission line poles approximately 30 feet long.
Set 4 deadmen.
Antenna then to be installed by the Government.
8. (a) Existing antenna wires to be removed by the Government.
Remove 4 long poles, for disposal.
Remove 3 short poles.
(d) 4 antenna support poles, approximately 90 feet long.
(e) Erect 5 transmission line poles, approximately 30 feet long.
(f) Set 4 deadmen.
*412 (g) Antenna then to be installed by the Govment.
9. (a) Existing antenna wires to be removed by the Government.
Remove 8 long poles for disposal.
(c) Remove one snort pole.
(d) Erect 4 antenna support poles, approximately 90 feet long.
(e) Erect 2 transmission line poles, approximately 30 feet long.
if) Set 4 deadmen.
(g) Antenna then to be installed by the Government.
Group C:
10. (a) Erect 30 transmission line poles, approximately 30 feet long, as directed.
2-04. The procedure for erection of antenna supports and transmission line poles will be determined by the Government in a manner to cause the least possible interference with the operation of the Navy Communication Station. * * *
The sequence of work prescribed in the specifications could not be followed by plaintiff due to the failure of defendant promptly to remove the wires from the old antenna poles and so permit immediate removal of the old poles by the plaintiff. Since the work was spread over a wide area, the disruption of plaintiff’s work was considerable by reason of the necessity of moving with heavy equipment from antenna to antenna to install new poles and return later to remove the old poles. Also, the delay on the part of defendant in removing the antenna wires prevented plaintiff from removing the poles that had been designated as piles and thus delayed the construction of the culvert and the road. The evidence establishes that plaintiff, under the circumstances, diligently prosecuted the work and would have completed the antenna support and road work before the winter if defendant had followed the sequence of construction required by section 2-03 of the specifications.
7. About September 15,1948, plaintiff completed the erection of new antenna support poles, had removed a limited number of the old antenna poles, and was continuing to *413 remove such old antenna poles as wires were removed therefrom by the defendant.
Some of the poles unremoved at that time had been designated by defendant as piles to be used for the culvert. The plaintiff was ready to proceed with the road work in July. The road was to be a thin surface road and the construction could not be completed until piles for the culvert had been driven, the culvert constructed, and the fill over the culvert had been made because the road would not hold the heavy equipment necessary for these purposes. It was not until November 15th that the piles were made available by defendant for the culvert, and the culvert was not completed until December. This delay threw the road work into the winter and it could not be completed by January 28,1949.
8. On September 17,1948, plaintiff advised Public Works as follows:
Due to circumstances beyond our control and without any negligence on our part, we will not be able to complete the above contract within the time stipulated. We have been delayed by many problems so we are outlining below the reasons for requesting extension of time:
1. We have experienced one of the worst rainy summei’s that has occurred for a long time. Inasmuch as we were working around the golf course and great care had to be exercised in order not to cause any damage, we were compelled to cease full operations depending on weather and ground conditions.
2. The specification outlines very clearly a method of procedure on the erection of the antenna poles. This procedure was not adhered to since it would have involved a great deal of starting and stopping operations for the work which the government was required to do under the contract. Therefore, we went ahead with as many groups of poles as we could set, in order to cause the least amount of inconvenience to the government forces. We have completed the setting of all poles for several weeks; and naturally the operation of removal of poles cannot proceed until the government has removed the wires on the old groups and erected same on the new groups.
3. The work of modifying one of the greens has been held in abeyance until cooler weather permits placing of lawn work. Also during this period of *414 the year the activity on a golf course is greatest; and we have been delaying this work to permit a tapering off of the golf sport.
4. Materials have been a handicap due to the critically short supply of reinforcing steel. As of this day of writing, we still do not have the reinforcing steel for the spillway structure and, therefore, our progress is impeded.
5. We experienced delay in the starting of the road work, inasmuch as someone apparently had destroyed stakes, which your engineers originally placed, showing the center line of the road. These were replaced about 2 weeks ago and our work immediately followed.
In view of the fact that these delays were beyond our control, we will require an extension of time accordingly.
On September 27, 1948, Public Works acknowledged receipt of plaintiff’s letter of September 17, 1948, stating that “certain” of the delays enumerated in plaintiff’s letter merited consideration. The letter continued by requesting additional information concerning the extent of the alleged delays resulting from the different factors referred to by plaintiff.
9. On October 15,1948, the Navy Communication Station was advised of a Fleet Communications Problem which was to start November 1,1948, and last for several weeks. At this time many of the antenna wires had not been removed by defendant from the old antenna support poles, including among such poles twelve designated for use as pilings to support the road culvert. In anticipation of use of the antennas supported by the old poles in the Fleet Communication Problem, defendant stopped the removal of antenna wires therefrom and early in November 1948 authorized the purchase of poles for such piling for defendant’s account.
10. Under date of November 8, 1948, plaintiff wrote the defendant as follows:
Last week we held a conference at your request for the purpose of discussing our reasons for stopping work on the above contract; we discussed finally the following work which had been stopped by us and we stated the reasons for the delay. We are confirming the facts below.
*415 (1) Pile driving had never been started by us inasmuch as 12 of the piles which we had earmarked for the structure could not be provided by the government based on information that we were given, until some time after December 12,1948.
(2) Inasmuch as the contract could not be completed until after the middle of December and the fact that all of our progress was contingent on completing the culvert there was not sufficient work on hand to permit us to maintain men on the site.
(3) The pipes crossing the roads were not installed by us since they had not come in from the mill.
(4) The manholes which are located adjacent to the road in which the buried cables are spliced cannot be completed until the various end covers are received by us from the Beading Steel Company in Pennsylvania.
We are pleased to report that the following work, since our last conference, is entirely completed.
(1) Lawn work in connection with area 1.
(2) All pipe culverts have been installed.
(3) The ditch which was excavated for the buried cable and entirely backfilled with the ground being fertilized and seeded.
(4) The driving of the piles has practically been completed.
Your authorization permitting us to purchase piles on the outside for which we will be paid as extra to the contract by you, has greatly benefited the progress of the work.
You have given us verbal authorization to proceed with the extra work of installing the pipe culvert, however, as yet we have not received your written authority.
11. On December 6,1948, plaintiff replied to Public Works’ letter of September 27,1948, requesting estimates from plaintiff as to the extent of delays caused by the various factors set forth in that letter, plaintiff in reply stating:
* * * * #
In view of the delays we have encountered to date not due to fault or negligence on our part we will require an extension of time from today in the amount of 50 working days in order to complete all remaining work. It is difficult for us to estimate the time in calendar days, since weather is so uncertain this time of the year.
Subsequently, on December 20, 1948, plaintiff wrote the following letter to Public Works:
*416 We are taking this opportunity to write to you advising you that our progress is being impeded due to weather conditions which are now prevailing.
We have been trying to make arrangements to start the placing of the penetration macadam road for the past two months but between rains and other weather difficulties we have not met with any success. Now we are confronted with the snow storm that started on Sunday, December 19, and this precludes our ability to start the placing of this stone until ground conditions at the site permit the start of operations.
Please rest assured that as soon as favorable conditions permit we will start this phase of the work and this should enable us to wind up the final stages of this job. At the completion of the work we will require an extension of time to cover the delays we have experienced not due to fault or negligence on our part.
12. Under date of January 6,1949, change order “A” was prepared by Public Works and submitted to plaintiff, it providing:
Owing to the following additional work, namely that you furnish labor and material required for the construction of a road culvert as shown on N. A. Drawing No. 9048, and for the purchase of piling, the contract price, in accordance with Article 10 of the contract is hereby increased $1,445 (Appropriation 1770601, “Maintenance, Bureau of Ships, 1947,” and funds made available to Naval Gun Factory by Bureau of Ships project order 677/47 dated 3 June 1947; Shipment Bequest 1627; Activity 171; payment by Navy Central Disbursing Officer, Bureau of Supplies and Accounts, Navy Department, Washington 25, D C.) and for delays on the part of the Government in dismantling antenna from poles to be removed and used for piling, the contract time is extended from 13 October 1948 to 15 February 1949.
It is requested that you indicate below your acceptance of this change and return the original and one copy to this office.
On January 28,1949, Public Works wrote plaintiff:
The contract completion date for the subject contract was extended to 15 February 1949 by Change “A”. Due to the current extremely wet weather, it is desired that completion of the road work be postponed until the area has dried out as necessary to insure proper conditions for depositing fill and laying pavement. A further time *417 extension will be authorized when extent of delay is determined.
Plaintiff was in agreement with this course of action and thereupon without protest discontinued work on the project.
13. On March 17, 1949, plaintiff wrote Public Works the following letter:
We wish to acknowledge receipt of your letter of March 11, 1949, calling our attention to the fact that change order A dated January 6, 1949, has not been accepted by us and returned to you.
We have not signed change order A inasmuch as several changes have been made in the scope of the work as follows:
1. Our original estimate to you for the work covered on your drawing #9048 in the amount of $1252.00 dated October 26,1948, contemplated your performing the work in accordance with the drawing. However, you have placed two pipes in a line instead of one pipe as originally called for. This has changed some of the quantities and should affect our price.
2. Change order A indicates an extension of time due to the delays caused us on the part of the government in dismantling antenna from poles. This delay has also resulted in the road work being thrown into the winter conditions with the result that work had to be suspended due to the inclement weather. This has caused us to have equipment idle and standing by waiting for the good weather to resume. It would seem that this condition would justify our receiving consideration for recovering the costs we have incurred due to these delays which are not caused by our fault or negligence.
We would appreciate your reviewing this matter and advising us whether, under the terms of the contract, the intent is to reimburse the Contractor should the delay on the part of the government cause hardship, and whether or not our request is in order.
On March 24, 1949, plaintiff received the following letter from Public Works:
Referenced letter indicated the desire that road work be postponed until the area for road construction had dried out. It now appears that this work can resume and you are hereby directed to continue to carry out the requirements of the subject contract.
*418 With regard to your letter of 17 March 1949, relative to tbe claim for additional compensation under Change “A” and for standby time for equipment, your attention is invited to Article 10 of the contract which requires submission of claims within ten days of receipt of written order from the Contracting Officer. You have failed to comply with this requirement in both instances. However, it is requested that you prepare a justification of your claim with complete itemized estimates and that you present this claim in person for review by a Board on Changes consisting of yourself, Mr. J. H. H. Poole and Commander H. H. Bagley as members.
In the meantime, it is recommended that you accept Change “A” inasmuch as partial payments made on the contract cannot include any work done under this change until it is properly executed.
Your attention is invited to the fact that the funds under which the subject contract was authorized were appropriated for fiscal year 1947 and must be entirely expended before the end of the current fiscal year or they revert to the Treasury. Therefore, all work must be completed, accepted and vouchers must be drawn prior to June 12,1949, so that you can be compensated for work done without recourse to Congress for additional funds.
14. On January 28, 1949, when work under the contract was postponed because of bad weather, plaintiff had not completed construction of the access road, as well as some other items of work. For the construction of the road plaintiff had rented a roller at a price of $335 per month, and a motor patrol at a price of $583 per month. Plaintiff did not return this equipment to the owner during the work stoppage, due to the impossibility of anticipating the duration of such stoppage, and due further to the fact that such equipment was difficult to obtain on short notice.
15. On May 16, 1949, plaintiff wrote Public Works as follows :
PART I
In our original estimate for the work covered on your drawing #9048, we incurred an additional cost of $185.00 due to there being two pipes in the culvert instead of one as originally planned.
*419 FART II
Due to our inability to install antenna supports as scheduled in the contract, we ran into additional cost that was not contemplated when we contracted for the job. Listed below are the costs that were additional to our anticipated costs because of interrupted sequence in the setting of the radio equipment. The machines we kept on the job were needed on other jobs and we feel that we should be reimbursed for the fair cost of the same.
Supervision cost_ $380.00
Equipment lost time:
1 crane 62 hrs. at $8.00_$496.00
1 bulldozer 62 hrs. at 7.00_ 434.00
1 roller 30 hrs. at 8.00_ 240.00
1 road patrol 30 hrs. at 8.00_ 240.00
- 1,410.00
Total cost due to delays_$1,790.00
PART ill
In reference to item 2 in our letter to you of March 17, 1949, the equipment made idle because of the road work being thrown into winter construction, we have estimated the cost to us for this idle time as follows:
1 roller irom December 1 to April 1 — 4 months at $335.00 per month_$1,340.00
1 road patrol from December 1 to February 1 — 2 months at $583.00 per month_ 1,066.00 [3]
We would appreciate your prompt attention to these items.
16. On May 20,1949, Public Works responded as follows:
The subject contract has been reviewed together with claims submitted by your letter dated 16 May 1949, and, as a result thereof, the Officer in Charge of Construction proposes to recommend a change to increase the contract price by $189.00 and extend the time for completion by 101 days making the new completion date 27 May 1949. In addition, you are entitled to $200.00 under contingent bid item 10 for removal of two additional trees. Basis for the foregoing is contained in the following paragraphs.
(a) Article 1 of the contract includes bid items 2 to 9, inclusive, to cover additions and deductions for removing or not moving 80-90-foot poles, 80-foot poles and *420 deadmen. According to a check made by the Navy Communication Station on 26 July 1948, the poles to be removed, erected or left in place corresponds exactly with the specifications so no adjustments in the contract price are necessary for these items.
(b) Bid item 10 of Article 1 provides for removal of additional trees at $100 per tree.. On directions of the Officer in Charge of Construction, you removed two trees at the transformer station between the dam and the road constructed under this contract. Therefore, an additional payment of $200 is due you under the contract.
(c) Your letter of September 17? 1948, requested an extension of time by reason of five items listed therein. Item 2 of your letter mentions delay caused by change in procedure for erection of antenna poles. No mention is made of any increase in contract price occasioned by these delays. This letter was acknowledged on 27 September with request for specific estimate of time required. Your letter of 6 December 1948 gave estimate of 50 working days from that date as date of completion and again no mention was made of additional compensation. Change “A”, dated 6 January 1949, authorized extension of time to cover delays due to revised procedure in erection of antenna and for delays due to inclement weather. In view of the extended correspondence mentioned above, together with the requirements of Article 10 of the contract that claims must be made in writing to the Officer in Charge of Construction within 10 days, the claim for $1,700 in Part II of your letter dated 16 May 1949 for additional costs due to inability to install antenna supports as scheduled is considered to be not valid.
(d) Your claim in Part I of your letter dated 16 May 1949 for $185 for additional work required for installation of two pipes in culvert in lieu of one pipe as shown on N. A. Dwg. No. 9048 is considered to be reasonable and will be included in recommendation for change order. In addition, it is proposed to extend the time for completion by 15 days.
(e) In letter dated 28 January 1949, the Officer in Charge of Construction indicated the desire to postpone completion of road work until weather conditions improved and the area dried out. The last day that work was done on the road was 18 January 1949. On 24 March 1949, you were advised that work could continue and on 14 April 1949 or 86 days after work ceased, you resumed operations. It is considered reasonable to extend the completion time by an equivalent amount.
*421 (f) In regard to claim for idle time for road roller and road patrol, Part III of your letter of 16 May 1949, it is proposed to submit this claim to the Bureau of Yards and Docks for a decision. However, before this submission can be made, the following information is required:
(1) Was equipment owned or rented?
(2) If owned, what was the original cost of the equipment, the number of years used, annual depreciation, insurance, and overhead?
It is requested that you signify your concurrence with the change as proposed in the first paragraph so recommendation can be forwarded to the Bureau of Yards and Docks without delay. If this change is not approved and accepted prior to submission of final voucher, it will be necessary to deduct liquidated damages of $40 per calendar day for the time between the present completion date of 15 February 1949, and the actual completion of the work. In order to avoid this penalty, it is considered advisable to treat the claim of subparagraph (f) as a separate matter. In the event that this claim is not settled at the time the final voucher is submitted, you have the privilege of including it as an exception when executing the release required by Article 6 (e) of the contract.
This letter is being forwarded by registered mail to insure its prompt delivery.
17. On May 26, 1949, plaintiff wrote Public Works as follows:
We acknowledge receipt and wish to reply, to your letter of May 20, 1949, regarding extra work performed by us on this contract.
We note that you are going to recommend a change order to cover the increase in the amount of $185.00, as listed in our letter of May 16, 1949, entitled “Part I.”
Regarding the extra trees under bid item 10 we wish to advise that there were 12 extra trees on the golf-course area, and therefore, your item allowing for 2 extra trees is incorrect. You have already allowed us for 12 of the extra trees in partial payments.
Concerning our request to recover costs we incurred as outlined in Part II of our letter of May 16, 1949, we respectfully ask that you reconsider our claim in the amount of $1,790.00 and would appreciate your forwarding this to the Bureau of Yards and Docks for their *422 approval. We note that you indicate in your letter that this request would not be valid because of the 10-day requirement of the contract; however, we feel that a just claim never runs out and that this condition was apparent while the work was in progress. We were not able to submit anything definite sooner than this time since we could not determine the extent of the damage until the work was completed. Moreover, inasmuch as the removal of poles was, in a sense, performed on a unit price basis and the government had the option to add or deduct at any time we would have no way of knowing when the extent of the work was considered complete until the entire work has been finally accepted. Even until last week there was some discussion at the job concerning replacing some of the other poles. The contract outlines a method of performing the antenna pole work and lists a very complete schedule of operations. In general the arrangements contemplated in the specifications lists a very systematic and orderly method of removing and erecting the various groups of poles with the minimum of inconvenience both to the government and to the contractor. Because of governmental business beyond the control of either the officer in Charge of Construction, the Navy Communication Station or the General Contractor, it was to the best interests of the government to alter this method of work and this caused our work to be delayed at various intervals. It also required our moving men and equipment from one extreme location of these poles to another, taking great precautions when moving the heavy equipment not to damage the golf course and this occurred many time. There were periods when our men could perform a certain amount of work during the day and were then compelled to stop due to interference of work either by reason of the operations of communications or due to the inability of the government to remove wires within a reasonable time.
The above factors of delay caused us to suffer in 2 ways; one, it caused increased costs in the antenna pole work, which could not be contemplated or foreseen at the time of our submitting our bid for this work; two, it caused delay and loss of time of equipment and men on the construction of the road inasmuch as the prosecution of the road work was contingent on removing sufficient long poles in order to be able to obtain the necessary piles to drive under the culvert of the road at the dam.
In this connection we wish to point out that work was started on the construction of the road on or about the *423 first of September 1948. At the time we started this road work we had based our progress on the fact that the antenna poles could be removed within sufficient time to enable the road work to commence and be completed without any interruption. It was not until sometime in the first part of November that we learned that the poles to be used as piles as specified in the contract could not be removed until sometime in December, if then. At the time we started work on the road in September we had a crane, D7 bulldozer, 3 wheel 10-ton gallon roller and a caterpillar #12 Diesel Autopatrol on the road work. We started with the grading and preparing of the subgrade of the road and completed all of the work that could possibly be done on the road, and then we were compelled to stop and wait until the culvert could be placed at the dam. We were under the impression that since time was of the essence of the contract, and we were constantly reminded of the importance or completing this contract as rapidly as possible, that there would not be any delay in obtaining the piles which were to be furnished by the government. We believe that you can readily appreciate our position and that we could not remove this equipment from the site without breaching our contract. It did not become apparent until sometime in November, after our work had been stopped on the road, that there was going to be considerable delay on obtaining the material you were to furnish; and we held a conference in your office at which time you gave us the authority to purchase this material on the outside and we would be reimbursed for same. On November 8, 1948, we wrote you a letter confirming your authorization permitting us to purchase the piles so that work on the road could proceed.
Now our request in Part II of our letter of 16 May, 1949, in the amount of $1,790.00, covers delays that we experienced both in labor and equipment due to the interrupted sequence in the antenna pole work and the construction of the road. Inasmuch as we were subject to liquidated damages in the contract if the work were not prosecuted with sufficient manpower and equipment we were compelled to keep this equipment and manpower on a “standby” basis during this period of idle time and ready to start at a moment’s notice, since we did not know from day to day when you would issue instructions to remove the poles thus permitting the road work to commence. Consequently since certain poles because of governmental communications’ affairs of high importance could not be disturbed, the method of work was altered *424 and we traveled from one end of the communications station to another and back and forth as required in order to permit the work to proceed and attempt to complete same within the time required in the contract.
For the reasons stated above we request that you allow us the $1,790.00 as requested under Part II of our letter of May 16,1949.
Concerning Part III of our letter of May 16,_ 1949, which covers equipment rental on a stripped basis due to the road work being thrown into the winter and in compliance with your request that we cease operations, we ask that we be reimbursed the cost of this rental. This work would have been entirely completed prior to the coming of winter had we been furnished the material that the government was to provide under the contract. It was not possible for us to remove this equipment away from the site and feel certain that it would be available to us whenever you had issued instructions to resume operations. We are not asking for any margin of overhead and profit on top of this and we would be perfectly satisfied if we were able to recover the cost of the rental. This rent is based on standard equipment rental rates on a stripped basis and we believe you will find this in order. In reply to Paragraph F of your letter of May 20,1949, we wish to advise that this equipment was rented by us from the Warwick Supply & Equipment Company, Inc., of Baltimore, Maryland.
Thanking you for your cooperation and trusting that we have completed our work to your satisfaction, we are * * *
18. On June 10, 1949, change order “B” was prepared by Public Works and subsequently, on June 14, 1949, accepted by plaintiff. This change order provides as follows:
Owing to the following mentioned change, duly authorized in the work under Contract NOy-16054, namely that you install two smaller diameter pipes in culvert in lieu of one pipe as shown on N. A. Drawing 9048, the contract price, in accordance with Article 10 of the contract, is hereby increased by $185.00 (Chargeable to Appropriation 1770601, “Maintenance, Bureau of Ships, 1947” and funds made available to the Naval Gun Factory by BuShips project order 677/47; payment by Navy Central Disbursing Officer, Bureau of Supplies and Accounts, Navy Department, Washington 25, D. C.); and by reason of the foregoing, and for delays in completion of the work due to causes Beyond the control and without *425 the fault or negligence of the Contractor, namely, unusually severe and wet weather, the contract time for completion, in accordance with Article 11 of the Contract, is hereby extended from 15 February 1949 to 27 May 1949.
It is requested that you indicate below your acceptance of this change and return the original and one copy to this office.
19. Under date of June 21, 1949, change order “C” was prepared and accepted, providing as follows:
Owing to the following change in the work, namely, revision in plans and procedure of construction by the Government, the contract price, in accordance with Article 10 of the contract, is hereby increased by $1,790.00 (Appropriation 1770601, “Maintenance, Bureau of Ships, 1947”, and funds made available to Naval Gun Factory by Bureau of Ships project order 677/47 dated 3 June 1947; Shipment Request 1627; Activity 171; payment by Navy Central Disbursing Officer, Bureau of Supplies and Accounts, Navy Department, Washington 25, D. C.) and with no change in contract time for completion.
It is requested that you indicate below your acceptance of this change and return the original and one copy to this office.
20. June 27, 1949, plaintiff received the following letter from Public Works:
With reference to your claim of $2,406.00 for equipment costs alleged to have been suffered because of cessation of the work at the Governments direction, you are advised that the Bureau of Yards and Docks [the contracting officer] has denied this claim on the grounds that it is in the nature of damages and therefore not com-pensable under the contract.
21. Upon the request of plaintiff, the matters concerning its claim for $2,406.00 were forwarded to the Bureau of Yards and Docks, and on August 26,1949, plaintiff received the following letter from the Bureau:
In response to your oral inquiry, you are advised that report from the Public Works Office at the Naval Academy does not indicate that the Government so modified your procedures under the subject contract as to cause additional costs and entitle you to additional compensation.
*426 Accordingly, there would appear to be no basis for reversing the Bureau’s decision denying your claim for $2,406 which was communicated to you by the Officer in Charge of Construction on 27 June 1949.
This is a final decision of the Contracting Officer under Article 16 of the contract.
Article 10 of the contract provided in pertinent part as follows:
(a) The Contracting Officer may at any time or times, by a written order, and without notice to the sureties, make changes in the drawings or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the cost of doing the work under this contract, or in the time required for its performance, an equitable adjustment in the pertinent contract terms shall be made as hereinafter provided and the contract shall be modified in writing accordingly. Any claim of the Contractor for such an adjustment must be made in writing to the Officer in Charge within 10 days from the receipt of such change order or within such longer period as may be allowed by the Contracting Officer. If the Officer in Charge considers that such change should result in a decrease in the Contractor’s compensation or time for performance or both, he shall so notify the Contractor. In either case, the equitable adjustment shall be made in accordance with the mutual agreement of the parties, provided, however, that if the parties are unable to agree, the Contracting Officer shall determine such equitable adjustment, if any, to be made in the contract terms, and his determination shall be final, subject only to appeal under the terms of Article 16. * * *
Article 16 of the contract provided in pertinent part as follows:
Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall mail to the Contractor a written notification of his determination. Within 30 days from said mailing the Contractor may appeal to the Secretary of the Navy, whose decision shall be final and conclusive upon the parties.- Pending decision of a dispute hereunder the Contractor shall diligently proceed with the performance of this contract.
*427 CONCLUSION or LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States two thousand five hundred and six dollars ($2,506).

 See finding 6 for entire sequence.

 Tills figure should have been 52,506, but due to a mathematical error by plaintiff the total was stated as $2,406. See finding 15.

 This figure should have been $1,166, since two months’ rent at $583 per month would be $1,166, not $1,066.