**ANTHONY P. MILLER, Inc., v. UNITED STATES.**

No. 45556.

Court of Claims.

May 3, 1948.

WHITAKER, J., dissenting in part.

———◆———

Herman J. Galloway, of Washington, D. C., (King & King, of Washington, D. C., on the brief), for plaintiff.

L. R. Mehlinger, of Washington, D. C., and H. G. Morison, Asst. Atty. Gen. (Irvin M. Gottlieb and S. R. Gamer, both of Washington, D. C., on the brief), for defendant.

Before JONES, Chief Justice, and MADDEN, HOWELL, WHITAKER and LITTLETON, Judges.

MADDEN, Judge.

The plaintiff on August 20, 1936, made a contract with the Government to construct for it the superstructure of the Westfield Acres Housing Project in Camden, New Jersey. The price was $2,488,500. The Government agency which acted in the making of the contract was the Federal Emergency Administration of Public Works, Housing Division. The time for performance was 365 days from the date of receipt by the contractor of notice to proceed. The notice, as issued, made the starting date of the contract September 8, 1936, and the completion date September 7, 1937. In the course of performance a large number of change orders were issued by the Government, which resulted in reducing the contract price by some $30,000 and extending the time of performance by 177 days, i. e., to March 3, 1938. The work was completed within the extended time, and no liquidated damages were assessed. The plaintiff, after completion, executed a certificate of settlement and release in which it reserved its right to assert the claims which are the subject matter of this suit.

The plaintiff's several grounds of complaint fall, in general, into two categories: first, those relating to work which it was required to do but which, it asserts, it was not obliged by its contract to do, and, second, damaging delays caused to it by acts or omissions of the Government which, the plaintiff asserts, were breaches of contract by the Government.

### Discrepancies in Foundation Work

■ The foundations for the project were constructed by another contractor under a separate contract with the Government. The plaintiff's contract required it to examine immediately the work of the foundation contractor and point out any discrepancies so that they could be remedied. The plaintiff did so and made a report to the Government's Contracting Officer who directed the foundation contractor to make corrections. There was controversy as to whether corrections had been made. A representative of the Government's inspection division in October, 1936, requested the plaintiff to make a resurvey

of the foundations to point out remaining defects. The plaintiff, in a letter written November 17, asked that it be paid $400 for the expense of the survey, which by that time had been made. The Government's agents took no action on the plaintiff's request for payment. Under Section 10 of the specifications, quoted in our finding 7, the plaintiff's claim was made too late, and it cannot assert it here.

### Delays Due to Proposed Architectural Changes

The next item of the plaintiff's claim is the damage alleged to have been caused by the Government by its delay in deciding whether to build the buildings according to the plans incorporated in the contract or to change those plans substantially. The plaintiff, of course, had an orderly procedure laid out for the economical use of its working force on this large project. This procedure is described in finding 5. But this procedure was made impossible, as our findings show, by the Government's dilatory conduct.

The plans for the buildings had been made by local architects in Camden, New Jersey. But in the final preparation of the papers for the invitation for bids, these plans were changed in the Washington office of Housing Division. The architects were not reconciled to the changes, and initiated conferences with the plaintiff and its subcontractors with a view to having their original plans restored as far as possible. As shown in our findings 14 to 21, the Government's deliberations upon this question dragged along until December 1936, at which time it ordered certain relatively unimportant changes. We have found that the plaintiff's progress on the job as a whole was delayed 50 days by this uncertainty. In the circumstances, the Government's conduct was a breach of contract. It had, in the contract, reserved the right to make changes, but a sensible reading of that provision does not give it the right to deliberate, in disregard of the interests of the other party to the contract, for as long as it pleases, upon changes so fundamental that the work can go forward only haltingly and uneconomically until the deliberations are concluded.

The plaintiff is not barred from recovery on this item of its claim by the action of the Contracting Officer, affirmed on appeal to the head of the Department, the Administrator of the United States Housing Authority, denying the plaintiff compensation for the delay. Articles 9 and 15 of the contract, quoted in finding 6, do not give this power of decision to the Contracting Officer. His power under Article 9 is to determine whether liquidated damages shall be assessed against the contractor for late completion of his work, and not whether unliquidated damages shall be assessed against the Government for its breach of an express or implied obligation under the contract.

If a contracting officer should award such damages against the Government, the Comptroller General would not allow them to be paid, and contracting officers generally disclaim any power to award such damages or deny them. See B–W Construction Co. v. United States, 101 Ct.Cl. 748, 771. If we allow the adverse decision of the Contracting Officer to prevent us from considering such cases on their merits, we are reading Article 9 as giving the Contracting Officer the power to decide claims for damages for breach of contract against contractors, but no power to decide such claims in their favor. Such a reading would be unfair as well as irrational. What we have said applies also to the power given to the head of the Department in Article 15 of the contract, to decide disputes on appeal. Langevin v. United States, 100 Ct.Cl. 15, 31.

We therefore allow the plaintiff to recover on this item of its claim. We discuss hereinafter the measure of its damages for the 50 days of its delay.

### Screen Doors

The plaintiff asserts that it was damaged because the specifications in the contract with regard to screen doors were not sufficiently detailed to allow the plaintiff to order their manufacture, and, by the time the Government had definitely described them, some months later, the price had gone up $147. The Contracting Officer, and the head of the Department on appeal, denied the plaintiff's claim. We think that

the indefiniteness of the specifications as to the screen doors was as obvious to the plaintiff as to the Government, and that the plaintiff should have, at least when the defect was called to its attention by a third party, brought the matter to the attention of the Contracting Officer in a sufficiently formal way to indicate that it was important that the matter be clarified promptly. Instead, the plaintiff made an oral request to a subordinate, and made no written request to the Contracting Officer until two and one-half months later, after which request the question was resolved with reasonable promptness.

### Electrical Changes

The gist of this item of the plaintiff's claim is that the Government specified electrical installations which were not in accord with the requirements of the Utility Company which was to supply electricity to the project, or with the requirements of the National Electric Code. In consequence there was confusion and delay in revising the plans and getting the electrical equipment installed, and the completion of the whole project was delayed by 10 days. We think it was a breach of contract for the Government, in writing the parts of the contract relating to electrical work, to neglect to write them in conformity with applicable requirements, so that when the time came for their installation, in the regular course of the work, they could be installed. We have, therefore, awarded the plaintiff damages for these 10 days of delay.

### Radiator Changes

The contract required the plaintiff to install radiators in the kitchens, and this was done. The electrical ranges in the kitchens were to be installed by the Government and, when it began to install them it was discovered that the doors of the ranges could not be opened because of the location of the radiators. This difficulty was the result of careless planning by the Government. The radiators had to be relocated and the plaintiff was paid for that work and for the additional material used. We have found that this change did not delay the completion of the contract work as a whole. The plaintiff was not, there-

fore, damaged by the Government's mistaken planning, and may not recover on this item of its claim.

### Color Schedules

In the contract the Government reserved the right to vary the color of the paints to be used throughout the project. It employed a color consultant to decide what colors to use. The consultant was dilatory in furnishing color schedules to the plaintiff, but we have found that the contract work as a whole was not delayed by this conduct, and the plaintiff has not shown that it was otherwise damaged by it. No recovery is allowed on this item.

### Temporary Heating

The plaintiff's contract included the construction of the central heating plant and the heat distribution system. The specifications of the contract also required the plaintiff to furnish temporary heating, if necessary, when sensitive work such as plastering and tile and linoleum laying was being done. On October 7, 1937, the Government ordered the plaintiff to maintain the temperatures required by the specifications, work of the kind named above being then in process. The central heating plant was not then ready for use; hence the plaintiff, from October 13 to December 8, 1937, supplied temporary heat by operating oil stoves, at a cost of $486.16. By early in December the central heating plant was in operation and the plaintiff expended for its operation until February 28, 1938, at which time the Government accepted the project as completed, the sum of $10,477.18.

The plaintiff filed a claim with the Contracting Officer for the cost of the operation of the heating plant, asserting that the reason that the project had not been completed and accepted before the winter of 1937–1938 when the temporary heat was furnished, was that the Government had delayed the plaintiff's progress. As we have shown above, we think that the Government did, in breach of the contract, delay the plaintiff. To the extent, therefore, that the plaintiff was obliged to keep the buildings heated at its expense before the Government accepted the project, in excess of what would have been necessary but for

the Government's breaches of contract, the expense is a proper element of the plaintiff's damage. We have found that, apart from the cost of testing the heating plant, which cost is properly chargeable to the plaintiff, the plaintiff spent $8,027.62 for temporary heat, down to February 28, 1938. We have found that the Government delayed the completion of the project by 60 days, 50 in connection with proposed architectural changes and 10 in connection with electrical changes. But for these delays the project, then, would have been ready to turn over to the Government about January 1, 1938. That still would have left the plaintiff under a duty to keep the buildings heated in the latter months of 1937. Further, the Government says, if the plaintiff had not been delayed in the autumn of 1936 by the proposed architectural changes, it would have reached a point of progress in the winter of 1936–1937 when temporary heat would have been required, and this would clearly have been at the plaintiff's own expense. These facts make the amount of the plaintiff's extra expense for temporary heat necessarily indefinite, and we determine it, as our best estimate in the circumstances, to have been $4,000, which amount we award the plaintiff on this item of its claim.

## Wage Increases

■ The contract papers provided, as shown in findings 64 and 65, stated minimum wage rates for the various classes of labor. The specifications said, in paragraph 5, that all disputes as to the payment of wages in excess of the stated minimum should be adjusted by the contractor. They said, in paragraph 7, that the minimum rates should be subject to change by the Federal Emergency Administrator of Public Works and that—"In the event that as a result of fundamental changes in economic conditions the Administrator from time to time establishes different minimum wage rates from those specified in the contract or contracts for work on the project, the contract price shall be adjusted accordingly by the parties thereto so that the contract price to the Contractor under any contract or to any subcontractor under any subcontract shall be increased by an amount equal to any such increased cost or decreased in an amount equal to such decreased cost."

The plaintiff urges that there was a fundamental change in economic conditions in that the depression lifted somewhat, labor became scarcer, and it was impossible to obtain labor at the minimum rates set in the contract. It says that in these circumstances it was the duty of the Administrator to raise the minimum wages and thus put the plaintiff and its subcontractors in a position where they would be reimbursed for the increases which they were obliged to pay. It says that it was at least the duty of the Administrator to put his mind on the question, when it was called to his attention, and that he never did so. The evidence indicates that the Government's agents interpreted the contract provision which we have quoted above as placing in the Administrator an uncontrolled discretion as to whether he would increase the minimum rates and thus entitle the plaintiff and its subcontractors to reimbursement, or would not, thereby leaving them to pay the increased wages out of their own pockets. This would be a remarkable provision to write in a contract, and we do not so interpret the contract. We think it was the Administrator's contractual duty to consider the question; that, though requested, he refused to do so; that if he had done so he would have concluded from the evidence that there had been a fundamental change in economic conditions within the meaning of the specifications, and would therefore have increased the minimum rates. The plaintiff and its subcontractors, by paying wages which became the prevailing wages in the area during the period of performance of the contract, expended $24,456.10 more than they would have expended in paying the minimum wages stated in the contract. We allow the plaintiff to recover this amount, most of which is recovered by it to the use of its subcontractors as shown in finding 69. See United States v. Blair, 321 U.S. 730, 737, 64 S.Ct. 820, 88 L.Ed. 1039.

## Water Connections

■ The facts relating to this item of the plaintiff's claim are shown in findings

70 to 75. The Government, as it had a right to do, withdrew the installation of certain water facilities from the plaintiff's contract and awarded the work to The New Jersey Water Company. That company performed the work diligently, and with due regard to the plaintiff's work which was proceeding concurrently. The digging of the ditches caused some inconvenience and harm to the plaintiff, but that is no basis for legal liability. There will be no recovery on this item.

## Wood Thresholds

The specifications were not clear as to just where, in the buildings, wood thresholds would be required. The specifications said: "Wood thresholds (except as otherwise specified under division "Wood Floors"), shall be provided and installed under doors where indicated on the drawings; at interior doors between kitchens and bathrooms and other spaces, and wherever else indicated or necessary due to a difference in floor elevations or finish floor materials."

The drawings showed the types of doors in the various locations and whether thresholds would be required. These drawings showed no thresholds at closet doors, nor at kitchen and bedroom doors. After the plaintiff had installed the doors of closets, and between kitchens and living rooms without thresholds, a question arose as to whether thresholds should have been installed, and the plaintiff wrote to the project manager asking for an interpretation of the specifications in that regard. The project manager responded with an interpretation requiring thresholds, the plaintiff installed them at a cost of $2,743.55, and made no protest or other claim for the additional cost until the final settlement in June 1938, at which time this claim, with the others here sued on, was reserved.

The plaintiff cannot recover on the threshold item. Its theory here is that this was extra work, not required by the contract. But the contract provides that such work must be ordered in writing by the Contracting Officer and the price stated in the order. This was not done and no protest or appeal was made.

## Repainting Walls

The plaintiff constructed the walls of the buildings as specified, except certain penthouse walls not here in question. The walls were, nevertheless, not impervious to water, and on February 15, 1938, the project engineer called the plaintiff's attention to approximately 500 walls which, he said, required repainting. The plaintiff protested and declined to repaint the walls unless it was given a proceed order providing payment for the work. A conference was held about this and about the problem of the walls whose paint had been damaged because of the plaintiff's faulty construction of the penthouses. The plaintiff accepted responsibility for the latter walls, and the Government agreed to have the remaining walls, about 460, which had been damaged as a result of the Government's faulty specifications, repainted at its own expense, which it did. However, before the conference, and between November 1937 and February 1938, the plaintiff's painting subcontractor had repainted many walls, at an expense of $4,627.99, which walls had been damaged by reason of the Government's faulty specifications, and as to which damage the Government had the same responsibility which it assumed, after the conference, with regard to the 460 walls.

Here again, as in the case of the thresholds discussed above, the plaintiff did not insist that this work which was beyond its contract obligation, be ordered in writing by the Contracting Officer. It did not protest, until after the work was done, nor obtain nor appeal from an adverse decision. It merely reserved the claim when it made its final settlement many months later. It cannot recover upon this item.

## Refinishing and Repainting Concrete Ceilings

It was thought that if the concrete ceilings were poured into plywood forms which had been varnished to make them smooth and impervious, paint could be applied directly to the smooth concrete surface and a satisfactory painted surface would result. However, when the first coat of paint was applied, small holes appeared which had

been hardly visible upon the unpainted concrete surface. The paint would not penetrate the holes and they appeared as dark pin point spots on the ceilings. The Government's inspectors insisted that these defects be removed, and the plaintiff's concrete subcontractor applied a plaster patching compound known as spackle to some 1,100 ceilings, at a cost of $9,032 for the spackle and its application. The painting subcontractor repainted the ceilings at a cost of $1,200. After about half the ceilings in the project had been thus treated, the Contracting Officer determined that this treatment was not necessary, and it was not required as to the rest of the ceilings.

 We think that the contract did not require the plaintiff to perform this work. As in Struck Construction Co. v. United States, 96 Ct.Cl. 186, the Government specifications contemplated a finish which, in fact, would not result if the specifications were followed. But here, as in the items relating to the thresholds and the repainting, the plaintiff made no written protest, did not insist upon being ordered in writing to perform the extra work and, of course, took no appeal. It cannot, therefore, recover on this item.

### Overhead

 We have found that the plaintiff's completion of the project was delayed 60 days by the Government's breaches of contract. In our findings 91 to 93 we have shown the continuing expense to which the plaintiff was put because of the prolongation of the period of performance. The job overhead and office overhead combined amounted to $255.72 per calendar day, a total of $15,343.20 for the 60 days of delay.

### The Government's Plea of Fraud

The Government has filed a plea of fraud, invoking the statutory provision that one's claim shall be forfeited if he corruptly practices or attempts to practice fraud against the United States in the proof, statement, establishment or allowance of a claim against the United States. 28 U.S. C.A. § 279. The Government's contention is that one Needham, who was put forward by the plaintiff as a subcontractor for the plumbing and heating work, was, in fact, only an agent of the plaintiff, which, through the agency of Needham, did the plumbing and heating work itself. The fraud element is asserted to be that by this device the plaintiff would obtain extra allowances of overhead and profit on any additional plumbing or heating work ordered by the Government in addition to that covered by the lump sum named in the contract. See finding 8 for the contract provisions as to awarding overhead and profit in such cases.

 Our findings 94 to 103 relate to the plea of fraud. We do not find in the evidence admitted by the Commissioner of this court, nor in the other evidence offered by the Government but not admitted, adequate proof of fraud on the part of the plaintiff, and we dismiss the Government's plea.

The plaintiff is entitled to recover $43,799.30.

It is so ordered.

JONES, Chief Justice, and HOWELL, and LITTLETON, Judges, concur.

WHITAKER, Judge (dissenting).

I dissent as to the allowance for wage increases.