Jokes, Chief Judge,
delivered the opinion of the court:
Plaintiff seeks to recover additional expenses incurred in-executing a Government contract. The increased costs resulted, it alleges, from errors in the Government’s specifications.
The contract was for cleaning and resealing joints on the runways, taxiways, parking stems, and hardstanding areas' at Andrews Field, Maryland. The specifications described three types of joints with the total amount of lineal footage-of each type, as follows:
Traverse Expansion Joints_ 27,600-
Normal Expansion Joints_ 127,100-
Construction, Contraction and Dummy Joints- 788,600-
One of the drawings with which plaintiff was supplied by the-Government and which subsequently became part of the contract purported to show one typical cross section for each of the three types of joints. Had the specifications been' correct both as to length and as to cross section about 300-tons of resealing material would have been needed to do the-job.
Actually the specifications were erroneous both as to the average size of the joints and as to their total length. In the performance of the contract the joints proved to be smaller than the cross section drawings, whereas the. actual lineal footage was as follows:
*913 Traverse Expansion Joints_ 56,400
Normal Expansion Joints_ 73,800
Construction and Contraction Joints- 806, 250
The plaintiff calculated that the change in lineal measurement had the following effect on the cost of performing the contract:
Traverse Expansion Joints (add)-$26,518.95
Normal Expansion Joints (deduct)_ 7,899.34
Construction and Contraction Joints (add)- 1,572.96
Plaintiff’s president made an inspection of the field prior to bidding on the job. He became aware at that time that the average joint specifications were incorrect and did not rely upon them. He did not apprise the defendant’s agents of this fact. Plaintiff’s president did rely upon the correctness of the lineal measurements of each type of joint. Both the Government’s engineer and plaintiff’s president proceeded on the erroneous assumption that the large traverse expansion joints were not on the taxiways, as is normally the case. At Andrews Field, however, the taxiways did have such large joints.
Plaintiff’s agents could not feasibly have made an actual check on the lineal measurements prior to bidding since that involved measuring some 175 miles of joints. By use of maps furnished by the defendant both parties could have computed the total length of the traverse expansion joints correctly had they not labored under the misapprehension as to the nature of the joints on the taxiways. This misconception accounted for the fact that plaintiff’s president did not notice the major error in the specifications.
Plaintiff’s president, relying on the Government’s lineal measurements, estimated 185 tons of filling material would be required to complete the job. He submitted the bid in accordance with this estimate. After the work had been partly completed, plaintiff’s superintendent first noticed that there were considerably more traverse expansion joints than had been specified. He called this matter to the attention of Mr. Starkey, who was the principal engineer and assistant air installations officer at Andrews Field. Mr. Starkey requested that the work proceed and stated that remeasurement would be made to determine whether there was additional footage, in which event plaintiff would be compensated.
*914 Plaintiff’s president bad further negotiations with the Government’s agents at the field concerning this error. He stated at that time that he was making a claim for extra work, but no request was ever made in writing on the part of the Government that plaintiff perform extra work, nor was a change order ever issued on the mistake in specifications. Meanwhile the work proceeded until suspension during the severest weather of the winter of 1946-47. The job was finally completed in April 1947. Plaintiff had used about 200 tons of sealing material in executing it.
Under date of April 15, 1947, plaintiff submitted a request for “additional payment” on account of the errors in the specifications described above. The figures and computations in this letter as well as an earlier similar letter were agreed upon between plaintiff’s president and Mr. Starkey. Neither letter came to the attention of Mr. Stone, the contracting officer, until a year later. At that time plaintiff submitted an invoice including $1,799.98 due under the contract and $20,192.57 for work because of the incorrect lineal measurements. Mr. Stone then discovered the previous claim letters in the files of the air installations office. Without any further communications between the parties Mr. Stone, under date of June 17, 1948, made certain purported findings of fact and decision rejecting plaintiff’s claim.
The findings of fact and decision appear to have been a decision based solely on legal considerations. They recited the terms of the contract documents, found that no extra work, materials or changes had been ordered by the contracting officer, stated that any work performed by the contractor in variance with or in addition to the contract was performed at its own risk and without order from the contracting officer, and decided that no amount was due the plaintiff over and above the unpaid balance of the contract price. The contracting officer failed to make any findings as to the extra work plaintiff had to do on account of the lineal measurements. The covering letter for Mr. Stone’s findings of fact and decision called attention to the “Disputes” clause of the contract and advised that any appeal should be made to the Board of Contract Appeals.
*915 Plaintiff’s president was absent on an extended business .and vacation trip wlien Stone’s letter arrived. The letter remained unopened until the return of plaintiff’s president, .by which time more than 30 days had elapsed since the mailing of the findings of fact and decision. Plaintiff submitted .an appeal to the Board of Contract Appeals but that agency, after detailing the facts of the case, rejected the appeal .because it had been submitted too late.
It is evident from our recital of the facts that plaintiff made its bid in reliance on erroneous specifications of the Government. It was entitled to rely upon these representations, not only because they were a matter in which the Government had special knowledge, but also because the plaintiff could not reasonably have discovered the mistake by inspection. It is well-settled law that the Government must answer in damages where it has thus misled one of its contractors. United States v. Atlantic Dredging Co., 253 U. S. 1; Hollerbach v. United States, 233 U. S. 165; United States v. Johnson, 153 F. 2d 846; Arcole Midwest Corp. v. United States, 125 C. Cls. 818.
The defendant has raised the point that plaintiff is precluded from seeking relief in this court because it has not exhausted its remedies under article 15 of the contract. That . article provided in part:
15. disputes. Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the Contractor at his address shown herein. Within 30 days from said mailing the Contractor may appeal in writing to the Secretary of War, whose written decision or that of his designated representative or representatives thereon shall be final and conclusive upon the parties hereto.
Since plaintiff did not take an appeal within 30 days, defendant contends that it is precluded from seeking relief in this court.
Were this a matter over which the contracting officer or . the Secretary of War (or his designated representative) had •.authority, we might agree with defendant’s contention. But *916 the claim is one for unliquidated damages. Over such, claims the executive departments decline to exercise jurisdiction, on the ground that they are not within their authority. Continental Illinois National Bank v. United States, 121 C. Cls. 203; Pottsville Casting and Machine Shops v. United States, 121 C. Cls. 129; Anthony, P. Miller, Inc. v. United States, 111 C. Cls. 252. Since the contracting officer had no authority to decide a claim of this kind it was not necessary to appeal from his decision. Pottsville Casting and Machine Shops v. United States, supra; Anthony P. Miller, Inc. v. United States, supra; see also Allied Contractors, Inc. v. United States, 129 C. Cls. 400.
Defendant stressed the contention that the Government should not be held for the error in the lineal footage as set out in the specifications since the invitations, by reason of a counter-balancing error in the cross section specifications, did not mislead plaintiff as to the total quantity of filling material necessary. The Government’s specifications estimated that 300 tons of material would be needed. The plaintiff, realizing that the average cross section drawings were inaccurate but relying on the lineal footage specified by the Government, estimated 185 tons. The plaintiff actually used somewhat more, that is, 200 tons. The Government therefore argues that plaintiff still used 100 tons less than the Government’s estimate. The fact remains, however, that plaintiff relied primarily on the accuracy of the lineal measurements. Had it called attention to the Government’s other mistakes, of which it was then aware, it would not have altered its bid. Perhaps the other bidders would have made lower bids. But it was not incumbent upon plaintiff to correct errors in the specifications; it was incumbent upon the Government to make them reasonably accurate. Moreover, plaintiff’s president stated that the average cross sections given in the specifications did not compare to any actual joints and were “worthless.” He may well have supposed that the error was so patent that no experienced contractor would have relied on them.
Nor do we think that the Government is right in contending that plaintiff was not damaged. The evidence does not show that the discrepancy between the 185 tons which plain *917 tiff estimated for tbe job and tte 200 tons which, it actually used was the result of normal inaccuracies in estimating for which plaintiff may be supposed to have made allowances in its bid price. Nor does it establish that this discrepancy was due to the joints’ excessive expansion which plaintiff left out of account and which plaintiff would not have encountered had it not delayed performance into the colder months of the year. The trial commissioner who heard the evidence has determined the value of plaintiff’s damages resulting from the errors in the Government’s specifications, minus such savings accruing to plaintiff where the Government had overstated the lineal footage. We adopt his finding that the fair and reasonable net damages amounted to $16,000. Plaintiff is, therefore, entitled to recover $16,000, and judgment will be entered in its favor in that amount.
It is so ordered.
Laramore, Judge; Madden, Judge; Whitaker, Judge; and LittletoN, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Eoald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a New York corporation having its principal office at Lynbrook, Long Island, New York.
Mr. Joseph H. Yon Eoeschlaub has been plaintiff’s president since its incorporation in 1936. During that time plaintiff has performed over 100 contracts for defendant, the majority of which involved contract work similar to that in this suit.
2. Under date of June 28, 1946, plaintiff by its president, J. H. Yon Eoeschlaub, and defendant by a purchasing and contracting officer, William M. Stone, an employee of the War Department, entered into contract 18-027-ac-7, whereby plaintiff agreed to perform certain work at Andrews Field, located in Prince Georges Comity, Maryland, near Washington, D. C., for the consideration of $89,999. Pertinent provisions of the contract and specifications are as follows:
*918 1. statement of work. The contractors shall furnish the materials and perform the work for Resealing-joints in Runways, Parking stems, Taxiways, and hard-standing areas for the consideration of $89,999 (Eighty-nine Thousand Nine Hundred and Ninety-nine Dollars) in strict accordance with the specifications, schedules, and drawings, all of which are made a part hereof and designated as follows: Specification entitled Special Provisions and General Provisions which is marked Exhibit A, drawing numbered P. E. 1.8-1 and P. E. 2.1-5-marked Exhibit B and C to contract W 18-027-ao-7. The work shall be commenced within not more than 15-calendar days after receipt of notice to proceed and shall be completed within 90 days thereafter.
2. specifications and drawings. The contractor shall keep on the work a copy of the drawings and specifications and shall at all .times give the contracting: officer access thereto. Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings' and not mentioned in the specifications,, shall be of like effect as if shown or mentioned in. both.. In case of difference between drawings and specifications, the specifications shall govern. In any case of discrepancy in the figures, drawings, or specifications, the matter shall be immediately submitted to the contracting officer, without whose decision said discrepancy shall not be adjusted by the contractor, save only at his own risk and expense. The contracting officer shall furnish from time to time such detail drawings and other information as he may consider necessary, unless otherwise provided.
3. changes. The contracting officer may at any time-, by a written order, and without notice to the sureties, make changes' in the drawings and/or specifications of this contract within the general scope thereof. If such changes cause an increase or decreasé in the amount due-under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered: Provided, however, that the contracting officer, if he determines that the facts justify such action, may receive- and consider, and with the approval of the Secretary of War or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final-settlement of the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Article 15 hereof. But noth *919 ing provided in tbis article shall excuse the contractor from proceeding with the prosecution of the work so changed.
4. changed conditions. Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract-shall with the written approval of the Secretary of War or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.
5. extras. Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order.
_ 15. disputes. Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided. by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the Contractor at his address shown herein. Within 30 days from said mailing the Contractor may appeal in writing to the Secretary of War, whose written decision or that of his designated representative or representatives thereon shall be final and conclusive upon the parties hereto. The Secretary of War may, in his discretion, designate an individual, or individuals, other than the Contracting Officer, or a board as his authorized representative to determine appeals under this Article. * * *
_ SP-02. work to be done. — The Contractor shall furnish all equipment, labor and materials to satisfactorily clean and re-seal joints in Concrete Eunways, Taxiways, Parking Stems and Hardstanding Areas as herein specified and noted on “Layout Plan of Andrews Field,” drawing number P. E. 1.8-1 and drawing of “Typical Joints as Constructed,” drawing number P. E. 2.1-5.
Traverse Expansion Joints_ 27,600 Lin. Ft.
Normal Expansion Joints_ 127,100 Lin. Ft
Construction, Contraction and Dummy Joints_ 788,600 Lin. Ft.
*920 GP-1. scope of WORK. — The work shall be complete and all work, material and services not expressly called for in the specifications or not shown on the drawings which may be necessary for complete and proper construction to carry out the contract in good faith shall be performed, furnished and installed by the contractor at no increase in cost to the Government.
GP-2. SITE INVESTIGATION AND REPRESENTATIONS.The Contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling, and storage of materials, availability of labor, water, electric power, roads and uncertainties of weather, the conformation and condition of the ground, the character, quality and quantity of surface and sub-surface materials to be encountered, the character of equipment and facilities needed preliminary to and during the prosecution of the work and all other matters which can in any way affect the work or the cost thereof under this contract. Any failure by the Contractor to acquaint himself with all the available information concerning these conditions will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for any understanding or representations made by any of its officers or agents during or prior to execution of this contract, unless (1) such understanding or representations are expressly stated in the contract, and (2) the contract expressly provides that responsibility therefor is assumed by the Government. Representations made but not so expressly stated in the contract shall be deemed only for the information of the contractor and the Government will not be liable or responsible therefor.
GP-18. quantities. — Within the limit of available funds, the Contractor will be required to complete the work specified in paragraph SP-02 whether the required work is more or less than that indicated therein, and final payment will not be made until the work is so completed. ,
GP-20. minor modifications. — The right is reserved to make such minor changes in the execution of the work as, in the opinion of the Post Engineer, may be necessary or expedient to carry out the intent of the contract, provided that the cost to the Contractor performing the work is not increased thereby, and no increase in the contract price will be allowed to the Contractor on account of such changes.
*921 3. The invitation for bids was issued by Mr. Stone, who was the purchasing and contracting officer of Andrews Field, on June 21, 1946, and while the record fails to disclose the bid opening date, the plaintiff’s bid was accepted and the contract was signed by the plaintiff on June 28, 1946.
Mr. Stone testified that he was limited in his authority to award a contract to a maximum of $5,000, and that it was necessary to send the contract to the Command Contracting-Officer, Bolling Field, Washington, D. C., to obtain approval for execution in behalf of the defendant. The contract form failed to reach Bolling Field in time for approval before'the allocation of funds expired at the end of June. It was then, necessary to obtain another allocation of funds, which delayed the actual execution of the contract by the defendant until December 9, 1946. The executed contract was transmitted to the plaintiff under date of January 15,1947.
4. Immediately upon receiving the invitation for bids,. Mr. Yon Boeschlaub went to Andrews Field, and was referred by Mr. Stone to Mr. Bobert B. Starkey, principal engineer and assistant air installations officer, one of whose functions was to supervise in behalf of the defendant the' performance of all maintenance and construction contracts at the base. The respective offices of Mr. Stone and Mr.. Starkey were at opposite ends of the same building about 100 feet apart. Their sections were distinct and each had separate filing facilities.
Mr. Starkey drove Mr. Von Boeschlaub in an automobile over 90 percent of the airfield, including all runways and taxiways, but only some of the parking stems and hardstands.. Mr. Starkey stated and Mr. Yon Boeschlaub understood that the proposed contract contemplated resealing of all joints-on the ways of the base. No discussion was had with respect to the correctness of the specifications. This inspection-lasted two or three hours, which was considerably more time than Mr. Starkey spent with any one of the other four or five bidders who were local contractors who had had previous experience on the base. At different locations, Mr. Yon Boeschlaub left the automobile and inspected the joints and dug into them with a knife to see how much cleaning was-necessary, but otherwise generally observed the ways from *922 the vehicle. From visual inspection and from pacing the runways at some points, Mr. Yon Roeschlaub judged that the traverse expansion joints on the runways were 120 feet apart, which was the usual distance encountered in his previous experience, and the actual distance on this base.
Mr. Starkey had been employed for one year as an engineer by the general contractor who built Andrews Field and thereafter had been in continuous employment at the base for ten years as a civilian employee of the defendant. He was directly concerned with the preparation of the technical provisions of the specifications and the drawings.
5. In preparing the plaintiff’s bid, Mr. Yon Roeschlaub considered correctly that the traverse expansion joints were 120 feet apart on the runways. Prior to filing the bid, he was supplied with two drawings which subsequently became part of the contract. Drawing P. E. 1.8-1 was a general layout plan, drawn to a scale of 1,600 feet to 1 inch, of the various runways, taxiways, parking stems and hard standing areas. It did not show any joints. Drawing P. E. 2.1-5 purported to show one typical cross section of each of the three types of joints. It was labeled as “Average sizes of typical joints as constructed,” and showed the width and depth in inches of the joints. At the time of the inspection, Mr. Yon Roeschlaub was provided with a map, designated as P. E. 2.50-1, which was like drawing P. E. 1.8-1 except drawn to a larger scale of 500 feet to 1 inch.
Approximately 800 tons of material would have been required to fill all joints had the lineal footage been as stated in the specifications, and had the cross section measurements, as shown on contract drawing P. E. 2.1-5, been uniform throughout the project. However, the contract performance proved that the cross section drawings very clearly did not show average but substantially greater than average dimensions' of the joints and did not purport to show the jagged and varying widths of the joints as they existed.
Mr. Yon Roesclaub did not rely upon the cross section drawings in computing the volume of sealing material necessary for the project. It was his judgment that the actual joints did not compare to the drawings and that they were “worthless.” He computed that 185 tons of material would *923 be sufficient. He realized that the cross section drawings did not represent the average joints, but made no mention of his judgment in this respect to the defendant’s representatives. Actually 200 tons of sealing material was used by the plaintiff on the entire project.
The largest joints on the project were the traverse expansion joints. By using the scale drawings' and assuming that the traverse expansion joints were 120 feet apart on the runways, Mr. Von Roeschlaub estimated that there were 27,600 lineal feet of that type of joint. This was the same figure contained in the specifications.
Normally these large traverse expansion joints are not on taxiways, and Mr. Von Roeschlaub erroneously assumed that there were none there. Actually the taxiways had large traverse joints which resulted from correction of an error in the original construction by cutting out the joints.
By using the drawings and relying upon his observations at the project and his experience on other Army bases, Mr. Von Roeschlaub estimated that there was a total of approximately 940,000 lineal feet of all three types of joints, relied upon the defendant’s figures as to the lineal footage of the respective joints, but erroneously assumed in making his bid that there was not more than the 27,600 lineal feet of the large joint. Had Mr. Von Roeschlaub known of this error, the plaintiff would have submitted a substantially higher bid.
6. As admitted in the pleadings, there was a rush to have the work done as the airfield was constantly in operation, and as the plaintiff was the lowest responsible bidder, it was directed to proceed with the work which began on August 16,1946. Plaintiff worked for more than five months before receiving any payment pending approval of the contract by the defendant, which was finally given on December 9,1946, at which time about 85 percent of the work was completed.
7. The joints resealed by the plaintiff under the contract consisted of spaces between the numerous large areas of concrete of which the runways, taxiways, parking stems and hardstanding areas' were constituted. These joints were of three types: (1) traverse expansion, (2) normal expansion, and (3) construction and contraction joints. The traverse *924 expansion, joints paralleled each, other and cut across the runways and taxiways at intervals of 120 feet, although those on the taxiways originally were normal expansion joints. The-normal expansion joints, considerably smaller than the traverse, ran longitudinally rather than across the ways. The-third type, the contraction or dummy joints, which were-much the smallest, ran parallel to and in between the various-traverse and normal expansion joints.
Since the traverse expansion joints crossed both the runways and taxiways at intervals of 120 feet, and since the contract map disclosed with reasonable approximation the lengths and widths of the runways and taxiways, both parties could have computed with these facts in mind that the lineal footage of traverse expansion joint would amount to about 56,000 feet, or more than twice the amount stated in the specifications.
As testified to by Mr. Starkey, it was more difficult to compute the lineal footage of the smaller joints existing on-hardstand areas because they had been constructed at varying times and their joints did not connect with those of' previously existing construction. The large size of this project contributed to the mutual error in computation, as more than 175 miles of lineal footage were involved. The lineal footage stated in the specification was derived from a field survey conducted under the supervision and direction-of Mr. Starkey, although he was not personally present when the actual work was done. Mr. Starkey stated that there was a great turnover in surveying personnel at the time and that he had to use enlisted personnel to some extent.
The contract documents indicated neither the intervals between the joints nor the location of the various types of joints.
8. Plaintiff proceeded with the contract work until sometime in October 1946 when plaintiff’s superintendent, Mr. Andrew Larsen, having kept a record of the lineal footage of work accomplished on the various types of joints, realized that about 27,600 lineal feet of traverse expansion joints, the amount stated in the specifications, had been done, and observed that there was a very substantial excess of that type of joint yet to be cleaned and resealed.- The work on the large joints was first done on the taxiways. Upon realizing *925 the existence of this excess footage, Mr. Larsen stopped the work and discussed the matter with Mr. Starkey who requested that the work proceed and stated that a remeasurement would be made to determine whether there was additional footage, in which event the plaintiff would be •compensated. This was the first time Mr. Starkey had had the mistake in the specifications called to his attention. Mr. .Larsen then telephoned Mr. Von Roeschlaub and advised him of the circumstances and the conversation with Mr. Starkey, and Mr. Von Roeschlaub said that he would come to the project and that in the meantime Mr. Larsen should proceed with the work, which recommenced the next morning.
Within 3 or 4 days, Mr. Von Roeschlaub arrived at the .project, conferred with Mr. Starkey at the latter’s office, and stated that he was making a claim for extra work. Mr. Starkey replied that if the plaintiff was due “an extra”, it would be paid for any work justified, and that he would have a survey of the lineal footage made by his engineers. No request was ever made in writing that the plaintiff perform extra work, nor was a change order ever issued on the mistake in the specifications concerning the traverse expansion joints. Mr. Stone, the contracting officer, was present in Mr. Starkey’s office during this conversation between .Mr. Von Roeschlaub and Mr. Starkey.
9. The project work was interrupted for a period of time from late 1946 to early 1947 on account of winter weather, but was resumed in early spring and satisfactorily completed by April 1947. In the meantime, defendant’s surveyors remeasured the quantity of work involved, and both Mr. Von Roeschlaub and Mr. Starkey agreed that the total work done was as follows: Traverse expansion joints, 56,400 lineal feet, or 28,800 lineal feet in excess of the amount called for in the specifications; normal expansion joints, 73,800 lineal feet, or 53,300 less than specified; and construction and contraction joints, 806,250 lineal feet, or 17,650 more than specified.
While the total lineage amounted to 943,300 feet on the figures set forth in the specifications, as compared to 936,450 of work actually done, the plaintiff’s cost of performance was .substantially increased for the reason that the work and *926 material cost per lineal foot is considerably greater on the traverse expansion joints than on the two other smaller joints.
The defendant’s resurvey of the lineal footage extended over a period of three or four months, with the remeasurement work being done intermittently, but completed by early February 1947. Had this remeasurement been done by two surveyors working continuously on a 40-hour week schedule, the survey would have required one or two weeks of time. Mr. Starkey testified that had he known of the mistake in the specifications at the time of the site inspection with Mr. Von Roeschlaub, there would have been an amendment to the contract invitation, and he would have extended the bid period.
10. On February 17,1947, Mr. Von Roeschlaub had a conference with Mr. Starkey and Captain Sprinkle, the air installations officer, relative to payment for the additional quantity of traverse expansion joints cleaned and sealed on the project. At the invitation of these representatives of the defendant, plaintiff addressed a letter, under date of February 27,1947, to the purchasing and contracting officer of the base, setting forth a computation of the cost of doing the extra work, stating that it would do the additional work at the prices quoted, and requesting an answer as soon as possible as the contract performance could be completed within a few days, weather permitting. This letter was received at the base and placed in the files in Mr. Starkey’s office, and not called to Mr. Stone’s attention.
Under date of April 15, 1947, plaintiff again wrote the purchasing and contracting officer, set forth the agreed re-measurements of the joints, and stated further as follows:
We hereby submit a request for additional payment for the overrun of placing Joints, based on the following computations.
On the Transverse Expansion Joints, there is an additional of 28,800 lineal feet of Joint over the contract quantity, which we estimate will cost 30^ per lineal foot for labor and will require 2100 cubic feet of Joint Sealer, or 135,450 pounds at 13{i per pound plus $4.00 per ton trucking cost, or a material and labor cost of $26,518.95.
There is also an overrun of 17,650 lineal feet of Construction — Contraction and Dummy Joints which have *927 a labor cost of 3^ per lineal foot plus a material quantity of 122.56 cubic feet, or 7,905 pounds at a cost of 13^ per pound and $4.00 per ton trucking, or a lump sum of $1,572.96 additional cost.
On the Normal Expansion Joints, we estimate a total credit due you for 53,300 lineal feet at a labor cost of 3$ per lineal foot and a material cost of $6,300.90 for placing 740 cubic feet of Joint Sealer, or a lump sum of $7,899.34.
Deducting $7,899.34 from the overruns of $28,091.91, our request for additional payment is $20,192.57 over and above our original contract price.
Please give this your earliest attention as to verification of these quantities and claim for payment of this additional work.
This letter was likewise not referred to Mr. Stone.
The figures and computations in the letter dated February 27,1947, and restated in the letter dated April 15,1947, were agreed upon between Mr. Starkey and Mr. Von Roeschlaub at the conference on February 17, 1947. The evidence does' not establish that Mr. Stone took part in these negotiations, but he was aware at that time that plaintiff was asserting a claim for extra work. The agreement between Mr. Starkey and Mr. Von Roeschlaub was reached after detailed discussion of sets of figures proposed by each of them, and Mr. Starkey then invited Mr. Von Roeschlaub to present the agreed figures in a claim to the contracting officer.
11. At the time of the approval of the contract by the defendant in December 1946, the sum of $106,000 was allocated or obligated for the project. These funds were set up on the budget and fiscal accounts of the Andrews base, but upon the contract approval, all the excess above the contract price was returned to the “Pentagon Building.” At about the time of the February 1947 negotiations between Mr. Von Roesch-laub and Mr. Starkey, Mr. Stone orally stated to Mr. Von Roeschlaub that he had been promised additional money on a quarterly allocation basis for maintenance work at the base, and that when the funds had been allocated, plaintiff would be paid for the additional work subject to calculations. Mr. Von Roeschlaub made oral inquiries from time to time, and was told that the funds had not been made available but that they were expected on the next quarterly allocation. *928 He reasonably assumed that plaintiff would eventually be paid for the extra work.
12. Partial payments on the contract price were made by the defendant to the plaintiff in the sum of $71,774.24 about January 14, 1947, and in the sum of $16,424.78 about May 15,1947, leaving a balance of $1,799.98 which is still due and unpaid on the contract price. No invoice was ever submitted by the plaintiff for this amount alone.
In April 1948 it was called to Mr. Stone’s attention that there was an unpaid balance on the contract price, and by letter dated April 9, 1948, he wrote the plaintiff as follows: “In order that final payment can go forward to Finance Office, certified invoice in triplicate must be submitted to this office.”
13. Under date of April 15, 1948, plaintiff submitted its certified invoice for $21,992.55, including within the itemized figures the balance of the contract price in the sum of $1,-799.98 and the amount of its claim for extra work in the sum of $20,192.57. Plaintiff therein cited its claim letter dated April 15,1947, and attached a copy thereof.
Upon, receipt of the invoice, Mr. Stone for the first time "became aware of the claim letter of April 15,1947. He made an unsuccessful search for it in his files, and then proceeded to the files in the air installations office where he located and saw for the first time the plaintiff’s letter dated February 27, 1947, but failed to find the original claim letter, a copy of which he had just been supplied.
14. Without any further correspondence or other communication between the parties, Mr. Stone prepared his written findings of fact and decision under date of June 17, 1948, in which he recited various terms of the contract documents, found that no extra work, materials or changes had been ordered by the contracting officer, stated that any work performed by the contractor in variance with or in addition to the contract was performed at its own risk and without order from the contracting officer, decided that no amount was due the plaintiff over and above the unpaid balance of the contract price, and concluded that the contracting officer would approve payment of the balance of the contract price in the sum of $1,799.98 upon submission of a properly certi *929 fied invoice by tbe contractor. Tbe contracting officer failed to make any finding as to tbe extra work performed.
With a transmittal letter dated June 17, 1948, Mr. Stone mailed a copy of bis findings of fact and decision to the plaintiff. Tbe letter called attention to the “Disputes” article of the contract and advised that any appeal should be addressed to tbe Board of Contract Appeals and submitted to Mr. Stone’s office substantially in tbe form of certain attached samples.
15. In April or May 1947 Mr. Stone bad walked into tbe air installations office concerning another matter, and Mr. Starkey mentioned to him that there was going to be “an extra” on the plaintiff’s contract, and that the air installations office was trying to obtain the necessary funds from the Strategic Air Command. Mr. Stone testified in this case that he did nothing about trying to obtain additional funds for the contract because it was not his responsibility but rather that of the air installations office. He further testified that if air installations had recommended his approval of a claim for compensation for extra work, he would not have acted upon the matter because his authority was limited to a maximum of $5,000, that he could not allow any claim for extra work, and that it would have been necessary for him to send the claim on to the Command Contracting Officer. He further stated that he never contacted “a higher command” about any claim for extras in this case. Actually the contract in issue, being for an amount in excess of $5,000, was not executed by Mr. Stone in behalf of the defendant until it had been submitted by him to and approved by the Command Contracting Officer at Bolling Field.
It is clear by his own admissions that the contracting officer was of the mind that he had no authority to allow a claim for extra work. His action on the plaintiff’s claim was based solely upon the absence of any written order for changes or extra work. He obviously gave no consideration to the actual performance of extra work, the attendant circumstances, and the negotiations and communications between the representatives of the plaintiff and defendant. He admitted in his testimony that he was not free to exercise his independent judgment in allowance of the plaintiff’s claim, *930 although he acted without advice or instructions from his superiors in denying the claim.
16. The transmittal letter and the copies of the appeal forms and of the findings of fact and decision of the contracting officer were received at the plaintiff’s office in due course of mail. At that time, Mr. Von Roeschlaub was absent on an extended business and vacation trip, which included fishing in Oklahoma, and did not return to his office until July 26, 1948, more than thirty days after the mailing of the findings of fact and decision by the contracting officer. Upon reading the transmittal letter and enclosures, Mr. Von Roeschlaub telephoned Mr. Stone and requested an extension of time to appeal. Mr. Stone replied that he would allow the time if it was within his province, but stated that he thought he was without authority to grant an extension. He requested Mr. Von Roeschlaub to submit a formal request by telegram and that in the meantime he would check with his headquarters to find out what he could do.
In the evening of July 26, 1948, Mr. Von Roeschlaub transmitted, and the next morning Mr. Stone received the following telegram:
With reference to your letter of June 17, 1948, referring to our Contract No. W 18-027-ac-7, I have just returned from extended trip and would appreciate extension of time to appeal to Board of Contract Appeals for [sic] your decision. Please wire if we may have such extension for 10 days.
Mr. Stone then checked with command authorities at Bolling Field who advised him that he could not extend the time, but that if the plaintiff forwarded an appeal, he should send the same to the Board of Contract Appeals.
On July 27,1948, Mr. Stone prepared the following telegram, which was sent through channels and transmitted and received by the plaintiff the next day:
It is not within the authority of the contracting officer to grant extension of time on an appeal of this nature Cma however Cma if an appeal is received it will be forwarded to the Board of Contract Appeals.
*931 17. On July 28,1948, the plaintiff appealed the contracting officer’s findings of fact and decision to the Army Board of Contract Appeals. The defendant’s motion to dismiss the appeal on the ground that it was not timely filed was allowed by the Board in its written decision and opinion dated January 31, 1949. The Board stated in part as follows:
It is obvious from the record that the appeal was not filed in accordance with the provisions of the “Disputes” article of the contract. Appellant, however, seeks to invoke the benefit of the Board’s Rule II, which permits the Board to consider an appeal on its merits, notwithstanding it was filed late, upon good cause shown. It is true that the Board has under certain circumstances waived the 30-day rule. But, on the whole, the cases in which the rule was waived concerned a situation in which the contractor was misled by the contracting officer in respect to the taking of the appeal. Appellant seeks to come within the rule of these cases on the basis of the alleged fact that it was led to believe that the decision of the contracting officer would be in the form of an allowance of its claim rather than a denial. It does not attempt to contend that the contracting officer misled it into believing that the decision was not a final one nor that the time for appeal had been extended. In fact, the decision called specific attention to the “Disputes” article of the contract and the method of appeal and inclosed a form to be used in making the appeal. It is difficult to understand how the action of the contracting officer in any way misled appellant. The request by the contracting officer for submission of a final voucher was notice to appellant of the fact that some action by the contracting officer was contemplated. That it might have been more considerate on his part, in view of the previous negotiations between the parties, to have told appellant that the claim in respect to alleged additional work was going to be denied does not deter from the fact that appellant had reason to believe a decision of some kind was forthcoming. It is inconceivable to the Board that under these circumstances a letter from the contracting officer would have been permitted to lie unopened for a period of over 30 days. There is no claim that the letter was addressed in such a way as to lead to the belief that it was personal in character rather than concerned with company business. It seems to the Board that ordinary business prudence would have re- *932 qnired that correspondence addressed to appellant company should receive the attention of someone connected with the company even though its chief executive was away on an extended vacation. This' would be true even though appellant had reason to believe that any correspondence expected from the contracting officer would be in the nature of good tidings.
It is the opinion of the Board that the failure to file the appeal in a timely manner was solely the fault of appellant. The Board has repeatedly held that the filing of an appeal in accordance with the terms of the contract is jurisdictional.
18. The fair and reasonable cost of cleaning and resealing the excess lineal footage of the traverse expansion joints and of the construction or contraction joints, after deduction of a fair and reasonable amount representing the extent to which the plaintiff’s cost was reduced on account of the lesser amount of lineal footage of normal expansion joints done by the plaintiff, was the sum of $16,000.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States sixteen thousand dollars ($16,000).