F. D. RICH CO., Incorporated, Appellant,

v.

WILMINGTON HOUSING AUTHORITY.

No. 16794.

United States Court of Appeals
Third Circuit.

Argued Feb. 8, 1968.

Decided April 10, 1968.

Lawrence Gochberg, Stamford, Conn. (Bayard, Brill & Handelman, Wilmington, Del., on the brief), for appellant.

Morris Cohen, Wilmington, Del. (Thomas Herlihy, Jr., Wilmington, Del., on the brief), for appellee.

Before HASTIE, Chief Judge, and FREEDMAN and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

FREEDMAN, Circuit Judge.

Plaintiff, F. D. Rich Co., Incorporated, as the successful bidder was awarded the contract by defendant, Wilmington Housing Authority, to construct a public housing project in Wilmington, Delaware. The present diversity action seeks recovery on two claims arising from the contract. One is for the additional cost of $33,677.75 which resulted from the Authority's requirement that plaintiff supply off-site or "borrow" fill material for areas in which plaintiff had contemplated using on-site fill material. The other claim is for additional expenses in heating the buildings and in storing electric refrigerators which resulted from the extension of the time for completion of the project, amounting to $12,567.10. The district court entered summary judgment for defendant on the claim for additional expenses and after a nonjury trial rejected the claim for the additional cost of fill.[1] From the final judgment for defendant, plaintiff has taken this appeal.

### I.

Plaintiff's first claim depends upon an interpretation of the contract specifications. As originally drawn the specifications permitted the use of on-site material as backfill against the foundations, making no reference to other areas of the site. Subsequently, however, the Authority issued Addendum 1 which required the use of "Test Controlled Compacted Fill" in some areas of the project and defined this term

so as to make it clear that the fill was to come from off-site locations, or "borrow pits". Addendum 4, which is the source of the dispute, provides:

> "*Excess Excavated Materials* from other areas of the site if found to be suitable by the local Authority may be used for Test Controlled Compacted Fill in areas three feet outside of building lines. No such material may be used for Test Controlled Fill at depth below level of building footings." (Specifications, Part III, Division 2, ¶ 8h(2).)

Plaintiff contends that ¶ 8h(2) authorized it to use on-site fill below the level of the building footings so long as it was three feet outside the building lines. This conclusion can only be reached, however, by making the first sentence absolute and by reducing the second sentence to mere surplusage, since by virtue of the first sentence on-site fill cannot be used within three feet of the building line at any depth. But the meaning of the second sentence is not so limited. It does not prohibit the use of on-site fill *directly* below building footings. Instead it forbids the use of such material at a depth below the *level* of the building footings. This clearly means that on-site material may not be used at a depth which is below a line projected from the building footings. Thus, the manifest meaning of the provision coincides with a construction which would not do violence to either sentence. It authorizes the use of on-site fill in areas three feet outside the building lines but prohibits its use below the level of the building footings.

Since the language of the contract is clear and without ambiguity and leads to a meaning which is both reasonable and sensible, there is no need to look beyond it in search of some other intention.[2]

1. The opinions of the district court are unreported.

2. See J. E. Faltin Motor Transportation, Inc. v. Eazor Express, Inc., 273 F.2d 444 (3 Cir. 1959); 3 Corbin on Contracts, § 535, pp. 19–21 (1960).

## II.

Plaintiff's second claim is based on the extension of the completion date of the contract granted by the Authority's Contracting Officer. As a result of this extension the Authority required plaintiff to assume the cost of providing heat for an additional heating season and to store electric refrigerators which were on hand but which could not be installed at the time.

■ Both of these items of expense would normally have been borne by the plaintiff under the contract.[3] The contract moreover contains a general "no damage" clause, common in public contracts:

"No payment or compensation of any kind shall be made to the Contractor for damages because of hindrance or delay from any cause in the progress of the work, whether such hindrances or delays be avoidable or unavoidable."[4]

Such a clause is now universally accepted as valid,[5] although it is, of course, to be strictly construed against the owner.[6] Plaintiff does not question the validity of the provision but argues that the present case falls within what it claims are three well recognized exceptions to its operation:

(1) where the delay is the result of bad faith on the part of the public authority;

(2) where the delay is of such a nature that it was not foreseeable by the parties;

(3) where the delay is so extensive that it constitutes an abandonment of the contract.[7]

Assuming the recognition of these exceptions in Delaware law[8] plaintiff has not brought itself within the range of any of them.

■ There was no proof of the claim that the Authority was guilty of bad faith. None of the evidence produced tends to sustain the contention either that the Authority withheld information about or misrepresented adverse soil conditions on the site. Indeed, the problem of soil conditions was one which was known to both parties before they entered into the contract. The specifications were altered as a result of special studies following suggestions by the United States Public Housing Administration and the time for submission of bids was therefore extended. Addenda 1 and 4 already referred to were issued by the Authority as the result of these concerns. Addendum 1 included data prepared by the Authority after an extensive subsoil investigation and Addendum 4 made it clear that the Authority assumed no responsibility for the soil conditions, by providing:

" * * * No responsibility is assumed by the Local Authority for subsoil quality or conditions other than at the locations, and at the time, the

---

3. General Conditions, Part II, § A, ¶ 27a, provides:
   "The Contractor shall provide and pay for temporary heating, covering and enclosures as directed by the Local Authority, * * * "
   Special Conditions, Part II, § B, ¶ 10b, provides:
   "* * * The Contractor shall provide and pay for any storage that may become necessary after delivery to him [of electric refrigerators] and shall assume all costs and risks incident thereto. * * *"

4. General Conditions, Part II, § A, ¶ 13b.

5. 5 Corbin on Contracts, § 1068, p. 388, and n. 87 (1964).

6. See Psaty & Fuhrman, Inc. v. Housing Authority of City of Providence, 76 R.I. 87, 93, 68 A.2d 32, 36, 10 A.L.R.2d 789 (1949); B.S.F. Co. v. Philadelphia National Bank, 204 A.2d 746, 751 (Del. 1964); Annot., Validity, Construction, and Application of No Damage Clause with Respect to Delay in Construction Contract, 10 A.L.R.2d 801, 804 (1949).

7. See Ace Stone Inc. v. Township of Wayne, 47 N.J. 431, 221 A.2d 515 (1966); Gasparini Excavating Co. v. Pennsylvania Turnpike Commission, 409 Pa. 465, 187 A.2d 157 (1963); Annot., supra, n. 6.

8. See Anthony P. Miller, Inc. v. Wilmington Housing Authority, 165 F.Supp. 275 (D. Del.1958).

exploration was made. * * * " (Specifications, Part III, Division 2, ¶ 2).

There is no claim that the Authority inaccurately set forth the results of its subsoil tests. Plaintiff in bidding for the job in these circumstances assumed the risk of what the subsurface soil conditions would be.[9] The fact that the Authority's Contracting Officer in extending the time for performance of the contract noted that there were many undetermined factors affecting the areas in which the soil problems arose is an admission only that adverse conditions were in fact encountered. Indeed, the specifications which so clearly called attention to the problem of soil conditions refute any claim that the Authority failed to indicate the possibility of unknown soil problems.

█ It follows from what has been said that the problem of soil conditions was one which was clearly within the contemplation of the parties and cannot be said to be the cause of a delay which was unforeseeable by them at the time of the contract.

█ The delay in the completion of the contract undoubtedly was extensive. But from this it does not follow that a finding would be justified that the parties had abandoned the contract or the "no damage" provision. The delay in the present case was not one which under the circumstances can be said to require the conclusion that it was not foreseeable by the parties and therefore could not have been intended to be governed by the "no damage" provision of the contract.[10] The conduct of the parties throughout the extended period of performance was in harmony with the provisions of the contract and gave no indication of any intention to abandon it.

█ Plaintiff's effort therefore to bring itself within one of the claimed exceptions to the "no damage" clause of the contract is unavailing. Moreover, the contract provided a mechanism through which plaintiff could pursue the present claims for additional compensation.[11] It did not, however, follow the contractual channel but sought reimbursement from the Authority only after the project had been completed and the costs deducted from the contract price. Even if this is not an automatic bar to the maintenance of the present action,[12] it indicates that plaintiff believed that it was to bear the expenses incurred by the extension of the time to complete

9. For an example of a similar disclaimer whose validity was upheld in harsher circumstances than those present here, see Philadelphia Housing Authority v. Turner Construction Co., 343 Pa. 512, 23 A.2d 426 (1942).

10. See People ex rel. Wells & Newton Co. of N. Y. v. Craig, 232 N.Y. 125, 133 N.E. 419 (1921).

11. General Conditions, Part II, § A, ¶ 10g, provides:
    "During the progress of the work, if the Contractor encounters at the site (1) subsurface or latent physical conditions differing materially from those indicated in the Contract or (2) unknown physical conditions differing materially from those inhering in the work of the character provided for in this Contract, he shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing. The Contracting Officer shall thereupon promptly investigate such conditions and if he finds that they do materially differ he shall cause such changes to be made in the Specifications and Drawings as he may deem necessary, if any, and shall make such equitable adjustment in the contract price or time as is justified, if any, by written order as provided in this Section 10 of the General Conditions. No claim of the Contractor for adjustment hereunder shall be allowed unless he has given notice as above required."

12. Cf. W. R. Ferguson, Inc. v. William A. Berbusse, Jr., Inc., 216 A.2d 876, 879 (Super.Ct. of Del.1966); Macri v. United States, 353 F.2d 804 (9 Cir. 1965); Anthony P. Miller, Inc. v. United States, 77 F.Supp. 209, 215, 111 Ct.Cl. 252 (1948).

performance of the contract, and confirms the conclusion that the "no damage" clause should be given full effect.

The judgment of the district court will be affirmed.